SEA LION, INC., Plaintiff,

v.

**WALL CHEMICAL CORPORATION and First Chemical Corporation, Defendants.**

**Civil Action No. H–94–4178.**

United States District Court, S.D. Texas, Houston Division.

June 9, 1996.

Eva Maria Fromm, Fulbright & Jaworski, Houston, TX, for plaintiff.

Frederick J. Bradford, McLeod Alexander Powel & Apffel, PC, Galveston, TX, for defendants.

### MEMORANDUM AND ORDER

ATLAS, District Judge.

Defendant First Chemical Corporation ("FCC") moves for summary judgment against the federal claims and breach of contract claim brought by Plaintiff Sea Lion, Inc. ("Sea Lion" or "Plaintiff"), and to dismiss Sea Lion's other state claims. *See* **FCC's Motion for and Brief in Support of Summary Judgment Against Sea Lion's Federal Claims and Breach of Contract Claim, and to Dismiss Its Other State Claims** [Doc. # 19] (hereinafter "Motion"). Sea Lion opposes summary judgment contending in essence that there are genuine questions of material fact. The Court has considered FCC's Motion, all responses and replies, the relevant authorities, and all other matters of record in this case. For the reasons stated herein, it is now **ORDERED** as follows:

- Sea Lion's claim under the RCRA is **DISMISSED.**

- Summary judgment *in favor of Sea Lion* is **tentatively granted** on the issue of CERCLA liability. FCC is granted ten (10) days from the date of entry of this

Memorandum and Order to file a brief and other materials it deems necessary addressing the Court's tentative conclusions. Sea Lion shall file a response no later than ten (10) days thereafter.

- FCC's motion for summary judgment is **GRANTED** as to Sea Lion's claim for cost recovery.

- Sea Lion's oral contract claim for reprocessing fees and expenses is **DISMISSED.** The parties shall notify the Court in the briefs to be filed hereafter whether or not any other contract claims remain pending in light of this Order and the settlement with Wall.

- A Pre–Trial Conference and oral argument will be held on Friday, July 12, 1996, at 9:00 a.m., regarding the contribution phase of the case under CERCLA and all pending motions. On or before July 3, 1996, the parties jointly should submit a status report and proposed procedure for handling this phase of the case.[1]

### FACTUAL BACKGROUND

Plaintiff owns and operates a small chemical processing company located in Texas City, Texas, which manufactures and sells specialty chemicals. Sometimes, Plaintiff uses what it refers to a "toll processing arrangement," where the customer supplies all of the raw materials to Sea Lion at no charge and Sea Lion uses those materials to manufacture a new product, which is returned to the customer for a fee. According to Sea Lion, title in the raw material, the work-in-process, and the finished product remains with the customer. *See* Sea Lion, Inc.'s Response to First Chemical Corporation's Motion for Summary Judgment [Doc. # 43] ("Plaintiff's Response"), at 2.

Wall Chemical Corporation ("Wall") is a "broker" that charges a fee to "place companies with processing capacity, like Sea Lion, together with companies that have a processing need." *Id.*[2] Defendant FCC is a chemical manufacturing company that manufactures and sells industrial and specialty chemicals from facilities in Pascagoula, Mississippi.

In the spring of 1986, there was a fire at FCC's Pascagoula plant that left FCC unable to produce a chemical mixture of 70% mononitrobenzene ("MNB") and 30% dinitrobenzene ("DNB").[3] FCC thus had to find an alternative source for this chemical mixture ("the DNB mixture").

A contract between FCC and Wall was negotiated and ultimately executed on August 27, 1986, and provided that Wall would be the temporary provider of the DNB mixture to FCC. *See* FCC/Wall Contract (Exhibit 6 to Motion). FCC, pursuant to the contract, issued a purchase order for a minimum of 2,500,000 pounds of the DNB mixture at $ 0.48 per pound delivered at Pascagoula, over the period September 1, 1986 to December 31, 1986.

In order to meet its contractual obligations to FCC, Wall negotiated and contracted with Sea Lion in August 1986 for Wall to supply Sea Lion with 2,500,000 pounds of material, from which Sea Lion would produce the DNB mixture and receive $ 0.35 per pound of mixture. According to its contract with FCC, Wall was responsible for "evaluating any technical information from FCC," and for delivering the DNB mixture to FCC. Motion, at 2–3; FCC/Wall Contract; FCC/Wall Purchase Order (Exhibit 7 to Motion). FCC contends that after making the DNB mixture, Sea Lion shipped it to FCC by invoicing Wall, which then immediately issued a Bill of Lading in FCC's favor, and invoiced FCC. Wall would then pay Sea Lion. FCC claims that, "throughout this process, FCC never dealt directly with Sea Lion under any contract." Motion, at 4.

FCC's contract did not mention or, on its face, involve Sea Lion. *Id.* However, the sum-

---

1. At the Pre–Trial Conference, the Court will address FCC's Motion for Leave to File Counter-Claim Against Plaintiff and Cross-Claims Against Co–Defendant [Doc. # 50]. If the motion is granted, response dates will be set.

2. All matters of dispute between Wall and Sea Lion have been resolved and Wall's motion to dismiss Sea Lion's claims has been withdrawn. *See* Does. # 59, 60.

3. Nitrobenzene and DNB are both classified as hazardous substances. 40 C.F.R. § 302.4 (1995).

mary judgment record establishes without contradiction that FCC representatives visited Sea Lion's facilities and conferred extensively with Sea Lion's staff to ascertain whether the latter could meet FCC's requirements.[4] An affidavit provided by Malcolm Colditz, President of Sea Lion, states that FCC provided Sea Lion with a sample of its MNB so that Sea Lion could perform a bench-scale test, that the bench-scale test was successful, and that FCC approved Sea Lion's process design.[5] The deposition of Thomas J. Mullaney, President of Wall, corroborates this account. Mullaney Deposition (Exhibit 14 to Plaintiff's Response), at 224. Allegedly, FCC advised Sea Lion to "begin construction on a nitration unit, even before the terms of the parties' agreement were memorialized," and Sea Lion began "around-the-clock construction" immediately. Plaintiff's Response, at 5; Colditz Affidavit, at 3.

FCC also contends that pursuant to the parties' written contracts, ownership of the DNB mixture remained with Wall. *Id.* Sea Lion disagrees, and asserts that FCC provided "the raw MNB to Sea Lion on a consignment basis since FCC would retain title to its material throughout the process." Plaintiff's Response, at 6; Representative Sample Trip Tickets for MNB Transportation from FCC to Sea Lion (Exhibit 16 to Plaintiff's Response). Sea Lion contends that this arrangement was a "toll processing arrangement," which it contends is essentially a bailment of goods for manipulation akin to repair. *Id.* at 6–7.

The first production run on the material, in September, 1986, did not meet the specifica-

tions in the FCC/Wall contract. FCC rejected the "off-spec" product as non-conforming and that product was never delivered to Wall's carrier for shipment to FCC. Motion, at 4–5. FCC "directed its rejection to Wall" and Wall complained to FCC ˙about FCC refusal to purchase the DNB mixture. *Id.*

Sea Lion claims that it immediately notified FCC of the processing problem and that FCC sent two representatives to assist Sea Lion in identifying the cause of the problem. Plaintiff's Response, at 7; Colditz Affidavit, at 4; Mullaney Deposition (Exhibit 20 to Plaintiff's Response), at 74–75.

Sea Lion contends that the first process runs were defective because, unbeknownst to Sea Lion, FCC had supplied it with raw material (MNB) of a poor quality which did not match the samples previously provided for the initial tests. Plaintiff's Response, at 7; Colditz Affidavit, at 4. FCC's summary judgment papers do not contest this explanation, although FCC does cite to Sea Lion documents stating that FCC had "inadvertently" supplied a sample which was low in benzene and had led to processing problems.[6]

Sea Lion further argues that FCC and Sea Lion representatives reached an oral agreement "either during this investigation or some time immediately after" that there should be an effort to rework the off-spec material, and that FCC allegedly asked Sea Lion to store the off-spec material and DNB mixture at Sea Lion's facility. Plaintiff's Response, at 7; Colditz Affidavit, at 4. Sea Lion contends that FCC breached its agreement regarding the off-spec material, which Sea Lion began to work on in November, 1986,

---

4. *See* Plaintiff's Response, at 4–5; Expense Report of John Garzaniti, Market Development Manager for FCC (Exhibit 13 to Plaintiff's Response) (documenting travel between Pascagoula, Jackson, and Houston in July, 1986).

5. Affidavit of Malcolm Colditz, President of Sea Lion (Exhibit 1 to Plaintiff's Response) (hereinafter "Colditz Affidavit"), at 2. In its Reply to Sea Lion, Inc.'s Response to Its Motion for Summary Judgment [Doc. # 45], FCC specially excepts to and moves to strike several portions of the Colditz Affidavit. Specifically, FCC argues that Colditz's affidavit is conclusory insofar as it states that FCC retained title to its material throughout the nitration process and that the raw chemicals were FCC's material. FCC also objects to Para-

graph 7 of the affidavit because it is premised upon Colditz's understanding and belief rather than his personal knowledge. The Court does not rely in this opinion on any of the allegedly objectionable averments in the Colditz Affidavit, and therefore does not address FCC's arguments.

6. *See, e.g.,* FCC's Motion, at 16 (citing Letter from Malcolm Colditz to Tom Mullaney dated August 27, 1987 (Exhibit 22 to Motion), at 2). The Court notes that some of the supporting material provided by FCC indicates that FCC previously took the position that its raw materials had met the contract's specifications. *See* Communications between FCC and Wall (Exhibit 25 to Motion).

after the minimum quantities of the DNB mixture had been delivered. Plaintiff's Response, at 7; Colditz Affidavit, at 4.

FCC refused to take delivery of the reworked material when Sea Lion attempted to deliver it in January and February, 1987, alleging that it still was off-spec, and refused to pay for the reprocessing services by Sea Lion. Plaintiff's Response, at 8–9; Colditz Affidavit, at 4–5. Sea Lion contends that FCC abandoned its product at the Sea Lion facility, making a variety of arguments that it did not have responsibility for accepting or paying for the material or DNB mixture. Plaintiff's Response, at 9; Colditz Affidavit, at 5.

The off-spec material ruined Sea Lion's tanks beginning sometime during the period 1986–89, when Sea Lion stored the material. Plaintiff's Response, at 10. Sea Lion discovered the problem during a tank reconstruction project, and blames the "significant contamination of the soil in the tank farm (storage area)" on FCC. *Id.* Sea Lion states that it stored the mixture at FCC's instructions and eventually "had no choice but to dispose of FCC's material." *Id.* Sea Lion therefore contends that FCC should pay for the tanks' replacement and the cost to rebuild its tank farm, as well as the remediation costs necessary to clean up the resulting soil contamination. *Id.*

Sea Lion brings claims against FCC for violation of the federal environmental statutes, for breach of contract, and for negligence and negligent misrepresentation regarding the toll processing transaction. *See* Plaintiff's Response, at 11; Plaintiff's Amended Complaint, at 11.

### *SUMMARY JUDGMENT STANDARD*

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc); *Bozé v. Branstetter,* 912 F.2d 801, 804

(5th Cir.1990). Then, typically, the Court ascertains whether "the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The facts are to be reviewed with all inferences drawn in favor of the party opposing the motion. *Bozé,* 912 F.2d at 804 (citing *Reid v. State Farm Mutual Auto. Ins. Co.,* 784 F.2d 577, 578 (5th Cir. 1986)). However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir.), *revised on other grounds upon denial of reh'g,* 70 F.3d 26 (1995).

Rule 56(c) "permits a court to grant summary judgment in favor of a party that did not request it." *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 28 F.3d 1388, 1397 (5th Cir.1994) (quoting *NL Indus., Inc. v. GHR Energy Corp.,* 940 F.2d 957, 965 (5th Cir.1991), *cert. denied,* 502 U.S. 1032, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992)). Before granting summary judgment *sua sponte,* a court must give ten (10) days notice to the adverse party, so that the party may come forward with all of its evidence. *Id.* (citing *Judwin Properties, Inc. v. United States Fire Ins. Co.,* 973 F.2d 432, 436–37 (5th Cir.1992)).

A party who makes a motion for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. For any matter on which the nonmovant carries the burden of proof at trial, however, the movant may, by merely pointing to the absence of evidence supporting the essential elements of the nonmovant's case, shift to the nonmovant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact so as to warrant a trial. *Transamerica Insurance Co. v. Avenell,* 66 F.3d 715, 718–19 (5th Cir. 1995); *Douglass v. United Servs. Auto. Ass'n,* 65 F.3d 452, 459 (5th Cir.1995), *revised on other grounds,* 79 F.3d 1415 (5th Cir.1996) (en banc); *Forsyth v. Barr,* 19 F.3d 1527,

1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994).

The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. *Douglass,* 65 F.3d at 459; *Little,* 37 F.3d at 1075. In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *McCallum Highlands,* 66 F.3d at 92; *Little,* 37 F.3d at 1075 (citing *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990)). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Little,* 37 F.3d at 1075 (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552).

### *DISCUSSION*
### I. *ENVIRONMENTAL CLAIMS*

Sea Lion asserts claims under the Resource Conservation and Recovery Act ("RCRA") and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") to recover its costs for disposing of material that was abandoned by FCC and was stored at Sea Lion's facility, as well as the clean-up costs associated with remediating the contaminated soil caused by leakage of the material allegedly owned by FCC in Sea Lion's tanks.

### A. *RCRA CLAIM*

■ Sea Lion's claim under RCRA was founded upon one Ninth Circuit case,[7] a lone decision contrary to numerous holdings by other circuits. On March 19, 1996, the United States Supreme Court reversed the Ninth Circuit and held that there is not a private

cause of action to recover prior costs of cleaning up toxic waste that does not continue to pose danger to health or environment at the time of suit. *Meghrig v. KFC Western, Inc.,* —— U.S. ——, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996). Therefore, Sea Lion's claim for such costs must be dismissed and Defendant FCC's Motion for Summary Judgment on the RCRA claims is **GRANTED.**

### B. *CERCLA CLAIM*

FCC contends that Sea Lion's claim under CERCLA must be dismissed because FCC did not "arrange for disposal" of hazardous substances under 42 U.S.C. § 9607(a)(3), since (a) it had no intent to arrange for such disposal, (b) it had no control over the hazardous substances, and (c) the release of nitrobenzene was not inherent in the chemical processing Sea Lion performed. FCC also argues in the alternative that, even if FCC could be held liable under CERCLA, Sea Lion's CERCLA cost recovery claim must be dismissed because one potentially responsible party ("PRP") under CERCLA cannot sue another PRP for cost recovery.

### 1. *FCC's Liability as a CERCLA Arranger*

To establish a prima facie case of liability, Plaintiff must prove, among other things, that FCC is a responsible party under § 9607(a).[8] CERCLA creates four categories of responsible parties. 42 U.S.C. § 9607(a). Sea Lion argues that FCC falls into the third category, which provides for liability of:

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned

7. *KFC Western, Inc. v. Meghrig,* 49 F.3d 518 (9th Cir.1995), *rev'd, Meghrig v. KFC Western, Inc.,* —— U.S. ——, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996).

8. Four elements must be proven in order to make out a prima facie case of liability under CERCLA: (a) that the site in question is a "facility" as defined in § 9601(9); (b) that the defen-

dant is a responsible person under § 9607(a); (c) that a release or a threatened release of a hazardous substance has occurred; and (d) that the release or threatened release has caused the plaintiff to incur response costs. *Joslyn Mfg. Co. v. Koppers Co., Inc.,* 40 F.3d 750, 760 (5th Cir. 1994).

or operated by another party or entity and containing such hazardous substances.

42 U.S.C. § 9607(a)(3).

CERCLA does not define the term "arranged for," and the statute's legislative history provides little guidance for interpreting the phrase "arranged for disposal." *See U.S. v. Aceto Agric. Chemicals Corp.*, 872 F.2d 1373, 1380 & n. 8 (8th Cir.1989). "Disposal" is defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 9601(29) (adopting definition in 42 U.S.C. § 6903(3)); *Joslyn*, 40 F.3d at 761.

CERCLA has been interpreted broadly, since Congress used broad language and "liberal judicial interpretation is consistent with CERCLA's 'overwhelmingly remedial' statutory scheme." *Aceto*, 872 F.2d at 1380 (quoting *U.S. v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726, 733 (8th Cir. 1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987) (*NEPACCO*)); *see also Cadillac Fairview/California, Inc. v. U.S.*, 41 F.3d 562, 565 n. 4 (9th Cir.1994); *Florida Power and Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1317 (11th Cir. 1990). The courts have engaged in a case-by-case analysis of arranger liability, relying upon many factors "to determine whether a sufficient nexus exists between the [PRP] and the disposal of the hazardous substance,"[9] including ownership of the substances, the intent of the parties to the transaction, who decided to place the substance at the facility, and who had authority to control the disposal of the hazardous substances.[10]

The Court finds on the extensive record before it that FCC's motion for summary judgment on the issue of arranger liability must be denied. Tentatively, the Court intends to grant summary judgment in favor of Sea Lion on the issue of arranger liability. The following gives the Court's reasoning supporting the tentative conclusion. Notice to FCC of this tentative conclusion is not strictly necessary, since FCC contends that there are no genuine issues of material fact on, and appears to have proffered all its evidence about, "arranger" liability. *See Leatherman*, 28 F.3d at 1397. However, FCC will be given ten days to file a brief on this issue, if it seeks to do so in light of this opinion.

The summary judgment record establishes that, irrespective of whether FCC *initially* intended to arrange for disposal of hazardous substances when it contracted with Wall in August 1986, FCC as a matter of law intended to arrange for disposal when it refused to take delivery of the off-spec material in early 1987.[11] The record establishes that there is no genuine issue of material fact as to several factors crucial in analyzing arranger liability. Specifically, FCC must, for the purposes of CERCLA analysis, be deemed to "own" the hazardous substances, to have had the "intent to arrange" for disposal of nitrobenzene and other hazardous substances, and to have had the authority to control disposal of the hazardous substances. Finally, there is no dispute that disposal of hazardous waste was inherent in the process of creating the DNB mixture. *Compare* Buboise, *supra* note 10, at 486 (courts generally impose liability when "a defendant retains ownership of raw materials, contracts with a third party for processing, and the generation and disposal of hazardous substances is inherent in that processing").

---

9. The Second Circuit has held that "[a]lthough arranger liability can attach 'to parties that do not have active involvement regarding the timing, manner or location of disposal,' ... there must be *some nexus* between the potentially responsible party and the disposal of the hazardous substance." *General Electric Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 286 (2d Cir. 1992) (emphasis added) (citation omitted).

10. Anna Marple Buboise, *Expanding the Scope of Arranger Liability under CERCLA*, 43 U. Kan. L.R. 469, 474 (1995). Buboise has noted that the courts have been "less than consistent" in analyzing arranger liability. *Id.* at 473.

11. *See* First Amended Complaint [Doc. # 14], ¶¶ 17, 23 (amended complaint identifies FCC's "arranging" as taking place both in the initial contracting relationship and in the abandonment of the off-spec mixture).

a. *"Ownership."*—The Court finds that there is no genuine issue of material fact as to FCC's ownership as a matter of law of the hazardous materials at issue. FCC has argued that it "sold" the hazardous material in question to Wall, and therefore that it no longer had title. FCC's Reply to Sea Lion, Inc.'s Response to Its Motion for Summary Judgment ("FCC's Reply"), at 9; FCC/Wall Contract (Exhibit 6 to Motion), § 2. However, the language of Section 107 allows for liability of any person who arranged for disposal of hazardous substances, even if the substances are owned by another party.[12] The courts have recognized that formal title to hazardous materials is not necessary in order for liability to be imposed.[13] Indeed, under definitive and well reasoned authorities, the ownership definition is quite broad and includes constructive possession. The Eighth Circuit held that a plant supervisor was liable as an arranger because he "actually knew about, had immediate supervision over, and was directly responsible for" arranging for the transportation and disposal of hazardous substances. *NEPACCO*, 810 F.2d at 743 ("[w]e believe requiring proof of personal ownership or actual physical possession of hazardous substances as a precondition for liability under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3), would be inconsistent with the broad remedial purposes of CERCLA"). *See also U.S. v. Vertac Chemical Corp.* 46 F.3d 803, 810–11 (8th Cir.), *cert.*

denied, 515 U.S. 1158, 115 S.Ct. 2609, 132 L.Ed.2d 853 (1995).

Although there were no contractual relationships directly between Sea Lion and FCC—rather, FCC had a contractual relationship with Wall, and Wall in turn with Sea Lion—Sea Lion's proof is unrefuted that FCC was significantly involved in arranging for and approving Sea Lion's work. *See supra* at 591–92. Even assuming FCC were able to establish that title to the materials was with Wall and not FCC, all involved knew that the purpose of the entire arrangement was to create a DNB mixture to certain specifications which—without question — would be returned to FCC. *See Louisiana-Pacific Corp. v. ASARCO, Inc.*, 24 F.3d 1565 (9th Cir.1994) (affirming district court's award of damages under CERCLA against defendant; defendant had contracted with a middle party to take away a byproduct called "slag," and middle party had subsequently sold the slag to third party logyards, who used the slag as gravel), *cert. denied*, 513 U.S. 1103, 115 S.Ct. 780, 130 L.Ed.2d 674 (1995); *see also Cadillac Fairview*, 41 F.3d at 565.

Moreover, FCC was indeed involved with Sea Lion's work in the intermediate stages of the process, and even sent its representatives to Sea Lion's plant once it was discovered that a batch was off-spec. Plaintiff's Response, at 22–23; Mullaney Deposition (Exhibit 20 to Plaintiff's Response), at 74–75.

**12.** CERCLA provides for liability of "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, *by any other party or entity*, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances." 42 U.S.C. § 9607(a)(3) (emphasis added). *See Cadillac Fairview*, 41 F.3d at 565 (because language of Section 107(a)(3) "explicitly extends liability to persons 'otherwise arrang[ing]' for disposal or treatment of hazardous substances whether owned by the arranger or 'by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity'," liability extends to persons who have sold and therefore no longer own the hazardous substances, and to persons who have no control over the process leading to the release of the substances).

**13.** *See, e.g., Catellus Development Corp. v. United States*, 34 F.3d 748, 752 (9th Cir.1994) (while continuing ownership or control of a hazardous substance is evidence of arranging for disposal, it is not required; requiring continuous ownership or control would make it too easy for parties who wish to dispose of hazardous substances to escape responsibility through sale and therefore to circumvent CERCLA's purposes); Buboise, *supra* note 10, at 477 ("[n]otwithstanding the *Aceto* rationale, ownership is not a prerequisite to a finding of liability under section 9607(a)(3)"). *Compare Maxus Energy Corp. v. U.S.*, 898 F.Supp. 399 (N.D.Tex.1995) (since the U.S. *never* owned the raw materials from which Agent Orange was manufactured, it could not have retained ownership of hazardous substances throughout the manufacturing process and therefore is not liable as an arranger under the *Aceto* test).

Even if title to the hazardous substances was formally with Wall rather than FCC, the Court must "see the forest for the trees." There is no dispute that Wall was nothing more than a broker in this arrangement, and that all of Sea Lion's work was done on FCC's raw materials, for FCC's ultimate benefit. *Cf. Catellus*, 34 F.3d at 752 (defendant cannot avoid having material defined as waste simply by selling the material to another party who then disposed of it); *Aceto*, 872 F.2d at 1381 (finding liability because, among other things, arrangement was conducted for defendants' benefit and at their direction).

Indeed, parties have been held liable as arrangers in cases in which they sold materials but knew that the arrangement would effectively dispose of its hazardous wastes, even though they had relinquished ownership with no intent to receive a finished product containing the materials sold. *See Cadillac Fairview*, 41 F.3d at 565 (CERCLA liability has been extended to persons who have sold and therefore no longer own hazardous substances); *U.S. v. Pesses*, 794 F.Supp. 151 (W.D.Pa.1992) (defendants who sold used batteries and knew that the hazardous substances would be disposed of at buyer's facility were liable as arrangers).

FCC therefore may not avoid liability merely by contractual maneuvers which attempt to relinquish formal ownership. FCC is deemed to satisfy the "ownership" element of the "arranger" analysis.

**b.** *Intent.*—CERCLA imposes strict liability on those who arrange for disposal. *Matter of Bell Petroleum Services, Inc.*, 3 F.3d 889, 897 (5th Cir.1993); *U.S. v. Aceto Agric. Chem. Corp.*, 872 F.2d 1373, 1377–78 (8th Cir.1989) (citing cases). *See also Buboise, supra* note 10, at 472 (apart from three narrow defenses, CERCLA imposes strict liability without regard to fault or negligence).

In this case, however, FCC argues vigorously that it did not arrange for disposal of a hazardous substance, but rather arranged to have the DNB mixture, a useful product, delivered to it. FCC relies heavily on a Seventh Circuit case in which the court refused to impose liability upon a defendant who had arranged for transport of a hazardous material, holding that an accidental spill of the hazardous material during transport did not suffice as an "arrangement" for disposal, even though the definition of "disposal" includes spillage.[14] *Amcast Industrial Corp. v. Detrex Corp.*, 2 F.3d 746, 751 (7th Cir.1993), *cert. denied*, 510 U.S. 1044, 114 S.Ct. 691, 126 L.Ed.2d 658 (1994). The *Amcast* Court stated that:

> [t]he words 'arranged with a transporter for transport for disposal or treatment' appear to contemplate a case in which a person or institution that wants to get rid of its hazardous wastes hires a transportation company to carry them to a disposal site. If the wastes spill en route, then since spillage is disposal and the shipper had arranged for disposal—though not in that form—the shipper is a responsible person and is therefore liable for clean-up costs. But when the shipper is not trying to arrange for the disposal of hazardous wastes, but is arranging for the delivery of a useful product, he is not a responsible person within the meaning of the statute and if a mishap occurs en route his liability is governed by other legal doctrines.

*Amcast*, 2 F.3d at 751.

FCC contends that it did not arrange for the defects in processing that led to the production of an "off-spec" batch, and that its only intent was to arrange for the delivery of a useful product that it was temporarily unable to produce in-house. FCC proffers the affidavit of Earl Adams, Process Technology Manager for FCC, which states that FCC had no intent to dispose of hazardous substances, and did not even reasonably expect the disposal of nitrobenzene to occur. Affidavit of Earl Adams (Exhibit 40 to Motion). FCC also directs this Court to a letter written by Sea Lion's President, Malcolm Colditz, stating that the processing problems occurred because FCC had "inadvertently" shipped a sample which was very low in benzene. Letter from Malcolm Colditz to Tom Mullaney dated August 27, 1987 (Exhibit 22 to Motion), at 2.

**14.** For the definition of "disposal" under CERCLA, *see supra* at 11.

The Court finds that FCC's evidence and argument are not dispositive on the question of intent. FCC's motion argues merely that FCC cannot be an arranger because that "[t]here is no dispute that FCC had no intent to dispose of hazardous substances *when it provided chemical[s] for processing.*" Motion, at 16 (emphasis added). FCC might plausibly make the argument that it did not *initially* intend for the off-spec material to remain in Sea Lion's tanks. However, this issue is beside the point under the undisputed facts in the summary judgment record. After it was known that Sea Lion's processing had resulted in an "off-spec" batch, FCC's refusal to take delivery of the hazardous substance clearly evidenced its intent that the material remain with Sea Lion or that Sea Lion deal with it thereafter. FCC abandoned the "off-spec" materials. FCC thus knew or should have known that Sea Lion would be forced to dispose of these materials. *Compare Aceto,* 872 F.2d at 1381 (courts have not hesitated to look beyond defendants' characterizations, such as a labeling certain transactions as formulation of a useful product, to determine "whether a transaction *in fact* involves an arrangement for the disposal of a hazardous substance") (emphasis added).

Therefore, the Court concludes that FCC's refusal to take delivery of the off-spec batch—which was clearly intentional rather than accidental—was an arrangement for disposal as a matter of law.

**c.** *Authority to Control and Decision to Place the Hazardous Substance at the Facility.*—Even if a party does not "own" hazardous substances, the party may "possess" the substances under the terms of Section 107(a)(3) of CERCLA[15] and therefore be liable as an arranger, because the authority to control the disposal of hazardous substances and the decision to place the hazardous substance at the facility are critical in CERCLA analysis. *Aceto,* 872 F.2d at 1381–82; NEPACCO, 810 F.2d at 743. *See also Florida Power and Light Co. v. Allis Chalmers Corp.,* 893 F.2d 1313, 1318 (11th Cir.

1990) ("even though a manufacturer does not make the critical decisions as to how, when, and by whom a hazardous substance is to be disposed, the manufacturer may be liable" as an arranger). The Second Circuit has stated that "it is the *obligation* to exercise control over hazardous waste disposal, and not the mere ability or opportunity to control the disposal of hazardous substances that makes an entity an arranger" under CERCLA. *General Electric Co. v. AAMCO Transmissions, Inc.,* 962 F.2d 281, 286 (2d Cir.1992) (emphasis original).

As discussed above, although the formal contracts are not drawn up between FCC and Sea Lion directly, all parties involved knew that the processing was being done for the primary benefit of FCC. FCC's representatives visited Sea Lion's plant at various times during the relevant period. *See supra* at 591–92. Moreover, FCC's contract with Wall determined the specifications of the material that would result from the nitration process by Sea Lion. FCC/Wall Contract (Exhibit 17 to Plaintiff's Response), at 2; *see also* Letter from Mullaney to Colditz dated August 5, 1986 (Exhibit 25 to Plaintiff's Response) (providing Sea Lion with copy for FCC's method of analysis).

FCC therefore made the decision to place the nitrobenzene and other hazardous materials at Sea Lion's facility, both at the initial stages of the contractual relationships and later when the "off-spec" batch was abandoned. Moreover, FCC's refusal to take delivery of the "off-spec" batch was evidence of its exercise of the authority to control the means by which the disposal for the hazardous substances. FCC eliminated the possibility of it using the material, as originally had been planned by all parties.

**d.** *Waste Inherent in Process.*—Plaintiff has presented evidence that the hazardous materials involved in this arrangement were not only the raw materials and the finished DNB mixture. There also was wastewater, spent nitric and caustic that were by-prod-

**15.** CERCLA provides for liability for "any person who ... arranged for disposal or treatment ... of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another p arty or entity and containing such hazardous substances." 42 U.S.C. § 9607(a)(3).

ucts of the nitration process which Sea Lion was hired to perform.[16] Although Sea Lion's First Amended Complaint [Doc. # 14], at 5–6, complains specifically of *nitrobenzene* as the chemical which caused the contamination requiring clean-up, rather than these by-products, the fact that the generation and disposal of such hazardous waste was inherent in Sea Lion's processing further supports FCC's liability. Several courts have relied upon the existence of a process which "inherently involves" the generation and disposal of hazardous waste, in combination with a showing of a defendant's ownership of the hazardous materials, as a basis for arranger liability.[17]

## 2. *Sea Lion's Claims for Cost Recovery and Cost Recovery*

Sea Lion has made claims for relief under two CERCLA provisions: the cost recovery provision, 42 U.S.C. § 9607(a), and the contribution provision, 42 U.S.C. § 9613(f)(1). The Court concludes that Sea Lion's cost recovery claim must be dismissed because Sea Lion is itself a potentially responsible party ("PRP"). However, Sea Lion does have a valid claim for contribution, and further proceedings are necessary in order to resolve the allocation of costs between the parties.

a. *Cost Recovery.*—Sea Lion has admitted in its discovery responses that it is a PRP under CERCLA. Request for Admission No. 71, Sea Lion, Inc.'s Responses and Objections to Defendant First Chemical Corporation's First Requests for Admissions (Exhibit 26 to Motion), at 29 ("Sea Lion admits that it is one of three potentially responsible parties relating to this case"). Sea Lion is potentially responsible because it is the present owner of the facility where the hazardous substances were released. *See* 42 U.S.C. § 9607(a); *Tanglewood East Home-owners v. Charles–Thomas, Inc.,* 849 F.2d 1568, 1572 (5th Cir.1988).

■ Given that Sea Lion is a PRP, a cost recovery action under Section 107 of CERCLA, 42 U.S.C. § 9607(a), is not viable. Rather, a claim for contribution pursuant to Section 113, 42 U.S.C. § 9613, is Sea Lion's appropriate relief. *See U.S. v. Colorado & Eastern R. Co. ("CERC"),* 50 F.3d 1530, 1535–36 (10th Cir.1995); *Akzo Coatings, Inc. v. Aigner Corp.,* 30 F.3d 761, 764 (7th Cir. 1994); *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 672 (5th Cir.1989). Therefore, FCC's motion for summary judgment as to Sea Lion's claim for cost recovery pursuant to 42 U.S.C. § 9607(a) is **GRANTED.**[18]

**16.** Plaintiff's Response, at 23; Telex from Tom Mullaney to Malcolm Colditz dated August 13, 1986 (Exhibit 18 to Plaintiffs Response) (Sea Lion to be responsible for wastewater, among other things); Colditz Affidavit, at 3, ¶ 6 (Colditz knew that "the generation of hazardous waste stream would be inherent to the process that [FCC] requested Sea Lion perform," and FCC officials were aware of this because Colditz discussed the issue with them during July and/or August, 1986).

**17.** In *Aceto,* for example, the defendants who had supplied the raw materials and contracted for pesticide formulation argued that they did not have any intent to dispose of hazardous substances, because their only intent was to arrange for formulation of a useful product. However, the court rejected this argument, holding that defendants were liable as arrangers because they had retained ownership of the materials throughout the process and the formulation process was conducted for their benefit and at their direction, and because the process inherently involved the generation and disposal of hazardous waste. *Aceto,* 872 F.2d at 1380–82. Similarly, the Ninth Circuit has looked to inherent generation of hazardous waste as an important factor in analyzing

arranger liability. *Catellus Development Corp. v. United States,* 34 F.3d 748, 752 (9th Cir.1994) (defendants who arranged for battery recycling, which inherently involved disposal of battery casings, cannot escape having battery casings defined as a discarded material simply by selling the battery to another party who then disposed of the casings); *Jones–Hamilton Co. v. Beazer Materials & Servs., Inc.,* 973 F.2d 688, 695 (9th Cir. 1992) (inherent generation of hazardous waste, in combination with ownership of the hazardous substances, sufficient to impose arranger liability).

**18.** The Court recognizes that this interpretation is not free from question. Although the weight of authority is in agreement with *CERC,* several district courts from outside the Fifth Circuit have squarely disagreed with the *CERC's* reasoning and held that the plain language of Section 107 permits PRPs to recover under the section. *See, e.g., Idylwoods Assoc. v. Mader Capital, Inc.,* 915 F.Supp. 1290, 1313 (W.D.N.Y.1996); *Charter Township of Oshtemo v. American Cyanamid Co.,* 910 F.Supp. 332, 336–37 (W.D.Mich.1995).

■ **b.** *Contribution.*—Response costs under CERCLA may be allocated among liable or potentially liable parties using such equitable factors as the court determines are appropriate. 42 U.S.C. § 9613(f)(1). The burden of proof is on the party seeking apportionment to establish that it should be granted. *CERC,* 50 F.3d at 1536.

■ The court must look to the "totality of the circumstances" in determining the relative contribution of the parties. *CERC,* 50 F.3d at 1536–37; *Kerr–McGee Chem. Corp. v. Lefton Iron & Metal Co.,* 14 F.3d 321, 326 (7th Cir.1994). The courts often rely upon the "Gore Factors," proposed as a moderate approach to joint and several liability by Vice President Albert Gore, which include the following:

(1) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished,

(2) the amount of the hazardous waste involved,

(3) the degree of toxicity of the hazardous waste involved,

(4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste,

(5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste, and

(6) the degree of cooperation by the parties with government officials to prevent any harm to the public health or environment.

*CERC,* 50 F.3d at 1536 n. 5; *Environmental Transp. Sys., Inc. v. ENSCO, Inc.,* 969 F.2d 503, 508–09 (7th Cir.1992). Other factors which may be considered include the relative fault of the parties and any contracts between the parties bearing upon the allocation of clean-up costs. *Kerr–McGee,* 14 F.3d at 326. Whereas liability under the cost recovery provision is allocated on a strict liability basis,[19] causation may be a relevant factor in the allocation of costs under CERCLA's contribution provision. *CERC,* 50 F.3d at 1534; *Farmland Industries, Inc. v. Colorado & Eastern R. Co., Inc.,* 922 F.Supp. 437, 440–41 (D.Colo.1996).

Additional facts and briefing will be necessary before the Court can issue a decision on the allocation of costs under CERCLA's contribution provision.[20] A Pre–Trial Conference to hear argument on the contribution phase of the case will be held on **Friday, July 12, 1996 at 9:00 a.m.**[21] On or before **July 3, 1996,** the parties jointly should submit a status report and proposed procedure for handling this phase of the CERCLA case.

## II.  STATE LAW CLAIMS

### A.  Breach of Contract.

■ FCC argues in its Reply that Sea Lion's breach of contract claim is barred by Texas' four year statute of limitations for contract actions. FCC's Reply to Sea Lion, Inc.'s Response to Its Motion for Summary Judgment [Doc. # 45], at 16–17 (citing Tex. Civ. Prac. & Rem.Code § 16.004 (Vernon 1986)). FCC argues that Sea Lion never plead this specific breach of oral contract theory in the state court proceedings it initiated in 1988, *see* Plaintiff's Original Petition (Exhibit L to Reply), and waited eight years to raise it. Sea Lion argues in response that

---

**19.** The liability standards for both sections are the same, since Section 9613 incorporates Section 9607. *See* 42 U.S.C. § 9613(f)(1) ("[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title . . .").

**20.** For example, the Court notes that there appears to be a question about the cause of the "off-spec" batch. While Sea Lion has alleged that the mishap occurred because FCC provided poor quality MNB, *see, e.g.,* Plaintiff's Response, at 7, FCC's communications with Wall reveal

that FCC previously took the position that its raw materials had met the contract's specifications. *See* Communications between FCC and Wall (Exhibit 25 to Motion). Moreover, evidence in the record shows that Sea Lion's President has previously stated that the incident occurred because FCC had inadvertently shipped a sample which was very low in benzene. *See* Letter from Malcolm Colditz to Tom Mullaney dated August 27, 1987 (Exhibit 22 to Motion), at 2.

**21.** The parties should be prepared to argue all pending motions at the Pre–Trial Conference.

the running of the limitations period for the state law causes of action has been tolled since 1988 when its original state court suit was filed. Sea Lion, Inc.'s Counter–Reply to First Chemical Corporation's Reply to Sea Lion, Inc.'s Response to First Chemical Corporation's Motion for Summary Judgment [Doc. # 56] (hereinafter "Plaintiff's Counter–Reply"), at 9.[22]

The question therefore is whether or not Sea Lion actually plead its claim for breach of oral contract in its state court petition.[23] Sea Lion's current papers clearly characterize the "oral contract" as an agreement between FCC and Sea Lion for Sea Lion to reprocess to "off-spec" materials. Plaintiff's Response, at 35–36; Plaintiff's Counter–Reply, at 11. However, the original petition states that Sea Lion's causes of action arise from an agreement of Sea Lion with FCC and Wall for the "process and production of a specialized chemical product." Plaintiff's Original Petition, at 2. The petition only refers to negotiations in the summer of 1986, *id.*, and characterizes Defendants' wrong as their refusal to accept or dispose of the "off-spec" product rather than as a refusal to pay for reprocessing. *Id.* at 4. Sea Lion's petition only makes a passing, vague statement that "[u]pon instructions from [FCC], the Plaintiff diligently tried to make corrections in the refining process in order to produce a satisfactory product." *Id.* at 3. The petition never makes any reference to an oral agreement between FCC and Sea Lion that Sea Lion would reprocess the "off-spec" materials and would be paid by FCC for the reprocessing services. Furthermore, the original

complaint in federal court, filed on December 9, 1994, refers only to "various contractual obligations" of FCC and Wall, and states that FCC refused to compensate Sea Lion for processing, storing, and disposing of the product. Original Complaint [Doc. # 1], at 7–8. There is no explicit mention of any oral contract as to payment by FCC for reprocessing services.[24] The Court therefore is persuaded by FCC's argument that Sea Lion's claim for breach of oral contract is newly asserted. Not until Sea Lion filed its First Amended Complaint, on May 19, 1995, was it explicitly alleged that FCC and Wall failed to fulfill "various oral and written contractual obligations" and that FCC had made an oral request for reprocessing.

The Court therefore is persuaded by FCC's argument that, since Sea Lion never made any claim for breach of oral contract in state court at all and never sought under any theory its reprocessing fees or expenses, the filing of that state court suit does not toll the limitations period. Sea Lion's claim for breach of oral contract for reprocessing fees and expenses, therefore, is barred by the statute of limitations.[25]

### Negligent Misrepresentation

FCC has recently filed an additional summary judgment motion as to Sea Lion's claim of negligent misrepresentation. FCC's Motion for Summary Judgment Against Sea Lion, Inc.'s Negligent Misrepresentation Claim [Doc. # 61]. Sea Lion has filed a motion to strike FCC's motion, *see Doc.* # 64, as well as a response. *See* Doc. # 65. FCC has in turn filed a response to the motion to strike, see Doc. # 66, and a reply to Sea

---

**22.** Sea Lion's Counter–Reply, the filing of which FCC does not oppose, objects to FCC's limitations argument having been raised for the first time in a reply brief. FCC argues in response that it could not have raised the defense sooner because Sea Lion has been very vague throughout this litigation about its contract claim and never clearly stated, until its response to the summary judgment motion, that it was based on the alleged oral contract between FCC and Sea Lion to wash the "off-spec" batches. *See* Doc. # 57. The Court agrees with FCC and therefore will decide the question of the applicable limitations period.

**23.** Although Sea Lion's Counter–Reply references an "Exhibit C," which it identifies as

"Plaintiff's First Amended Complaint" in the state case, *see* Plaintiff's Counter–Reply, at 10 n. 24, no Exhibit C is attached to the Counter–Reply.

**24.** In any event, the assertion of a contract claim for the first time in 1994 for services performed and known to a party in 1987 would be time barred as outside the applicable four year statute of limitations.

**25.** It appears that Sea Lion has no viable remaining breach of contract claims, in light of this ruling and the parties' settlement with Wall. As ordered at the conclusion of this opinion, the parties shall notify the Court whether or not any other contract claims remain pending.

Lion's response. *See* Doc. # 67. This motion will be addressed in a separate order. It is therefore

**ORDERED** that Sea Lion's claim under the RCRA is **DISMISSED.** It is further

**ORDERED** that summary judgment in favor of Sea Lion is **tentatively granted** on the issue of CERCLA liability. FCC is granted **ten (10) days** from the date of entry of this Memorandum and Order to file a brief and other materials it deems necessary addressing the Court's tentative conclusions. Sea Lion shall file a response no later than **ten (10) days** thereafter. It is further

**ORDERED** that FCC's motion for summary judgment is **GRANTED** as to Sea Lion's claim for cost recovery. It is further

**ORDERED** that a Pre-Trial Conference and oral argument are set for **Friday, July 12, 1996 at 9:00 a.m.** to address the contribution phase of the case under CERCLA and all pending motions. On or before **July 3, 1996,** the parties jointly should submit a status report and proposed procedure for handling this phase of the CERCLA claims. It is further

**ORDERED** that Sea Lion's oral contract claim for reprocessing fees and expenses is **DISMISSED.** It is finally

**ORDERED** that the parties shall notify the Court in the briefs to be filed hereafter whether or not any other contract claims remain pending in light of (i) this Memorandum and Order and (ii) the settlement with Wall.